## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELROY LUCKY JONES,                                    Case No. 15-cv-10974
                                                      Hon. Sean F. Cox
          Plaintiff,                                  Mag. R. Stephen Whalen

v

THE CITY OF DETROIT, a Michigan Municipal Corporation,
CHIEF ELLA BULLY-CUMMINGS,
INV. DALE COLLINS, SGT. WILLIAM ANDERSON,
INV. MAMIE HARDY, SGT. RAMON CHILDS,
THE ESTATE OF OFFICER ED WILLIAMS,
SGT. LANESHA JONES and OFC. ANTHONY WRIGHT,
Jointly and severally, in their individual and official capacities.

          Defendants.

| | |
|---|---|
| CRAIG A. TANK, P.C. | WE FIGHT THE LAW, PLLC |
| By: Craig A. Tank (P58360) | By: Racine M. Miller (P72612) |
| Attorneys for Plaintiffs | Attorneys for Plaintiffs |
| 228 North Main Ste H | 17600 Northland Pk Ct Ste 210 |
| Romeo, MI 48065 | Southfield, MI 48075 |
| Southfield, MI 48075 | (248) 443-9030 F: (248) 443-9031 |
| (313) 732-7134 | racine.michelle@gmail.com |
| craigtank@gmail.com | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, ELROY LUCKY JONES, by and through counsel,

We Fight the Law, PLLC, by Racine M. Miller, and for his First Amended

Complaint states as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action for declaratory relief and money damages

brought by a citizen and resident of the State of Michigan, Plaintiff, ELROY

LUCKY JONES, against Defendants City of Detroit, Chief Ella Bully-Cummings,

Sergeant Ramon Childs, Sergeant Lanesha Jones, Sergeant William Anderson,

Investigator Dale Collins, Investigator Mamie Hardy, the Estate of Officer Ed

Williams and Officer Anthony Wright for damages arising out of conduct which

occurred in 2006 when these Defendants, under color of state law, caused Plaintiff

to be arrested, maliciously prosecuted, tried and convicted on false criminal

charges without probable cause or even a reasonable suspicion that he had

committed a crime.  Plaintiff seeks a declaratory judgment that these officers, by

causing him to be prosecuted without legal probable cause, did violate his right to

be free from an unreasonable arrest or seizure of his person and deprived him of

his liberty without due process of law, and other rights, privileges and immunities

as secured by under the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Fourth,

Sixth and Fourteenth Amendments to the United States Constitution, and under the

Constitution, statutory and common laws of the State of Michigan.

2.      ELROY JONES was arrested on June 10, 2006 and wrongfully convicted on

July 31, 2008 for the fatal shooting of a Detroit man named Cleo McDougal.

3.     ELROY JONES spent over seven years in prison before evidence of gross misconduct surrounding the process through which he was arrested and convicted surfaced; and when it did, after numerous evidentiary hearings, a motion for new trial was granted on December 3, 2013 based upon the newly surfaced exculpatory evidence that had been withheld from ELROY JONES and his attorney, the Prosecutor and the Court by the Defendants back in 2006.  The prosecutor dismissed the case on January 23, 2014.

4.     There were four eyewitnesses, all of whom gave statements indicated that they did not know the suspect.

5.     The victim's brother, Martines Carter, who was present and witnessed the shooting, gave a statement that he did not know any of the assailants.  This was not mentioned in the Warrant Request.

6.     Instead, Defendants picked up Martines Carter the next day and "re-interviewed" him, employing impermissibly suggestive techniques, and showing Mr. Carter a single photograph of ELROY JONES, causing Carter to falsely and arbitrarily confirm that ELROY JONES was the shooter.

7.     The second statement was not corroborated by any other evidence.

8.     The withholding of the first statement prevented the prosecution and the defense from learning that the "identification"— which was substantially the only

evidence linking ELROY JONES to the crime—was both the product of undue suggestion and otherwise unreliable witness identification.

9.     Despite having 3 other eyewitnesses, no other witness was shown a photograph of ELROY JONES before the Warrant Request issued.

10.     Evidence that witness Martielle Barber had identified the driver involved in the shooting and had even been transported by Defendants to that residence was concealed by Defendants.

11.     Evidence of the identity of the real killer, including a 911 call for service made anonymously to the Detroit Police Department on July 2, 2006 which identified the real killer of Cleo McDougal and exculpated Mr. JONES and which made its way into CRISNET (but did NOT make its way into the homicide file of Cleo McDougal), was concealed by Defendants and prevented the prosecution and the defense from learning that there was an identifiable suspect, Mr. Brown, which could now be shown to the eyewitnesses who saw the shooter, but did not identify ELROY JONES as being the shooter.

12.     In 2012, the CRISNET report was uncovered by the FBI, and the remaining eyewitnesses were shown photo arrays; and each one was able to identify the actual shooter, who was not ELROY JONES.

13.     Has this information been released to the prosecution and defense in 2006, the cases against ELROY JONES would have been dismissed at that time; instead, the cases were not dismissed until after the information was revealed in 2012.

14.     On January 7, 2014, after seven (7) evidentiary hearings taking place between August and October of 2013, Plaintiff ELROY JONES, after serving over seven years behind bars as an innocent man, on January 7, 2014 was bonded out; and on January 23, 2014, he was finally exonerated.

15.     The Defendants, and each of them, did cause ELROY JONES to be subjected to a violation of his constitutional rights under the Fourth, Sixth and Fourteenth Amendments, amounting to an unlawful seizure of his person by way of false imprisonment, withholding of exculpatory evidence, and malicious prosecution, all of which resulted in his incredibly unjust arrest, trial, conviction and imprisonment for over seven years for a crime which Defendants knew or had actual notice that he did not commit.

16.     Lead investigator and supervisors Sgt. Ramon Childs, Sgt. Lanesha Jones, Sgt. William Anderson, and Inv. Dale Collins had actual knowledge of the exculpatory police report authored by Cynthia Thomas and deliberately or knowingly withheld it from the prosecution and defense, despite the fact that they knew or should have known that it exculpated ELROY JONES.

17.     The conduct of these Detroit Police Department officers was made possible by Defendant CITY OF DETROIT'S ("the City") policy, custom and practice of failing to properly train and supervise police officers in their investigations, including conducting and documenting identification procedures, avoiding manipulating and shaping the recollections of witnesses, preparing investigative reports, and disclosing exculpatory evidence. Had Detroit Police Department officers been properly trained and supervised, an innocent man would not have spent over 7 years of his life in prison.

18.     Each defendant officer has a history of supplying false information (or omitting exculpatory information) in Warrant Requests.

19.     Each defendant officer has a history of a previous reprimand for failure to properly preserve exculpatory information and otherwise cooperate with homicide investigations.

20.     The City was deliberately indifferent to the known and obvious consequences of its policies and customs regarding criminal investigations, particularly of the Homicide division, which was that innocent men and women would be illegally and unjustly convicted by unduly suggestive and arbitrarily conducted identification procedures and withholding of exculpatory information.

21.    Through this action, JONES seeks compensatory and punitive damages, declaratory relief, an award of reasonable attorneys' fees and costs, along with such other relief as this Court deems proper and just.

22.    Beyond compensating Mr. JONES for the over seven years that he spent in prison and his ongoing extreme suffering, all directly attributable to the Defendants' respective conduct—all committed pursuant to the customs policies and practices of the Defendant CITY OF DETROIT—this action seeks to remedy the unlawful CITY OF DETROIT policies, practices, and customs of failing to adequately train, supervise, investigate and discipline its officers, which led Defendants to violate the constitutional rights of ELROY JONES as guaranteed by the Fourth, Sixth and Fourteenth Amendments of the United States Constitution, and the laws of the State of Michigan.

## JURISDICTION

23.    Jurisdiction is conferred upon this Honorable Court by 28 U.S.C. §§1331 and 1343 (3) and (4) as this action seeks redress for the violation of plaintiff's federal constitutional and civil rights.

24.    Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

25.    Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state constitutional and state law claims that

are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

26.    This court has jurisdiction over these claims pursuant to 28 USC § § 1331, 1343, 2201 and 2202.  Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## JURY DEMAND

27.    Plaintiff hereby demands a trial by jury in this action on each and every one of his claims.

## PARTIES

28.    Plaintiff ELROY LUCKY JONES is a citizen of the United States, and was at all times relevant to this complaint, a resident of the City of Detroit, County of Wayne, State of Michigan.

29.    Defendant CITY OF DETROIT ("CITY") is a municipal corporation, authorized under and created by the laws of the State of Michigan. It is, and has been at all times relevant hereto, authorized by law to maintain and operate a Police Department. By and through its agents, including but not limited to the Chief of Police, its supervisors, operating officers, Boards, Commissions and Committees and its final policymakers, Defendant CITY, at all times relevant

hereto, established, promulgated and implemented the policies, written and unwritten, of the Detroit Police Department ("DPD"), with regard to hiring, training, supervision and discipline of the employees of said department, as well as the investigative practices and procedures of its Homicide Unit and the officers who worked within that Unit.

30.    At all times relevant to this complaint, each individual defendant was acting within the scope of his or her employment and under color of law as a police officer for the City of Detroit.

31.    Defendant ELLA BULLY-CUMMINGS was, at all times relevant herein, the City of Detroit official with final policy-making authority relevant hereto.

32.    Defendant INV. DALE COLLINS was at all times relevant herein a police investigator acting within the scope of his authority and under color of law as a supervisor in the Homicide Unit of the Detroit Police Department, one of the original Officers In Charge of the investigation, and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights. Upon information and belief, INV. COLLINS prepared the Warrant Request, which contained information known to him to be false, and omitted exculpatory evidence, and submitted it to the prosecutor, which resulted in the arrest and subsequent prosecution of Plaintiff.

33.    Defendant SGT. WILLIAM ANDERSON was at all times relevant herein a police officer acting within the scope of his authority and under color of law as a supervisor in the Homicide Unit of the Detroit Police Department one of the original Officers In Charge of the investigation resulting in the arrest and subsequent prosecution of Plaintiff, and testified at his criminal trial in that capacity, and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights. Upon information and belief, Sgt. Anderson improperly tampered with and withheld evidence, specifically, witness statements and Cynthia Thomas' CRISNET report; improperly influenced and manipulated the testimony of both Martines Carter and Michael Calhoun; and failed to properly investigate evidence including leads concerning the suspects and evidence concerning the incredibility of his key witness, Martines Carter.

34.    Defendant INV. MAMIE HARDY was at all times relevant herein a police investigator acting within the scope of her authority and under color of law as a supervisor in the Homicide Unit of the Detroit Police Department, and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights.  Upon information and belief, she conducted the second interview of Martines Carter, employing improper coercive technique to unduly influence and manipulate his identification of the suspect shooter as Elroy Jones, resulting in the arrest and subsequent prosecution of Plaintiff .

10

35.    Defendant SGT. RAMON CHILDS was at all times relevant herein a police officer acting within the scope of his authority and under color of law as a supervisor in the Homicide Unit of the Detroit Police Department and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights.  Upon information and belief, Sgt. Childs received exculpatory information contained within Cynthia Thomas' CRISNET report and failed to properly investigate or process, though channels, the newly-received information which ultimately exonerated ELROY JONES.  The conduct of Sgt. Childs resulted in the continued prosecution of Plaintiff.

36.    Defendant OFC. ED WILLIAMS was at all times relevant herein a police officer acting within the scope of his authority and under color of law as an officer in the Homicide Unit of the Detroit Police Department and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights. Upon information and belief, WILLIAMS received exculpatory information contained within Cynthia Thomas' CRISNET report and failed to properly investigate or process, though channels, the newly-received information which ultimately exonerated ELROY JONES.  The conduct of Ofc. Williams resulted in the continued prosecution of Plaintiff.

37.    Defendant SGT. LANESHA JONES was at all times relevant herein a police officer acting within the scope of her authority and under color of law as a

11

supervisor in the Homicide Unit of the Detroit Police Department and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights. Upon information and belief, Sgt. Jones received information from witness Martielle Barber concerning the identity and location of the man who drove the shooter away from the original altercation, driver, Marcus Martin, including driving past the location with Barber and taking a second Statement from Barber; Jones failed to turn over the second statement and failed to adequately investigate the lead, resulting in the wrongful arrest and prosecution of Plaintiff.

38.     Defendant OFC. ANTHONY WRIGHT was at all times relevant herein a police officer acting within the scope of his authority and under color of law as an officer in the Homicide Unit of the Detroit Police Department and was directly involved in the conduct which resulted in the deprivation of Plaintiff's constitutional rights. Upon information and belief, Ofc. Wright received information from witness Martielle Barber concerning the identity and location of the man who drove the shooter away from the original altercation, driver, Marcus Martin, including driving past the location with Barber and taking a second Statement from Barber; Wright failed to turn over the second statement and failed to adequately investigate the lead, resulting in the wrongful arrest and prosecution of Plaintiff.

12

39.     As to the negligent conduct of the Defendants, it is alleged that the

Defendants caused injuries to Plaintiff while acting in the course of employment or

service or on behalf of their governmental employer and:

> (a) Defendants were acting or reasonably believed that they were acting
> within the scope of their authority,
>
> (b) the governmental agency was engaged in the exercise or discharge of a
> governmental function, and
>
> (c) the Defendants' conduct amounted to gross negligence that was the
> proximate cause of  the injury or damage.

As to the intentional torts of the Defendants, it is alleged that:

> (a) The acts were undertaken during the course of employment and the
> employee was acting, or reasonably believed that he was acting, within the
> scope of his authority,
>
> (b) the acts were undertaken with lack of good faith, or were undertaken
> with malice, an
>
> (c) the acts were not discretionary.

40.     At all times relevant herein, the individual Defendants, and each of them,

violated clearly established rights guaranteed by the Fourth, Sixth and Fourteenth

Amendments of the United States Constitution, rights of which a reasonable police

officer and/or public official under these circumstances would have known, and of

which in this case defendants were on actual notice.

41.     The incidences complained of in this lawsuit occurred in the City of Detroit,

Wayne County, Michigan, with events that began on June 7, 2006.

13

### STATEMENT OF FACTS

42.    Plaintiff incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

43.    On June 7, 2006 at approximately 11:00 a.m., an unknown African American suspect a wearing white t-shirt and blue jeans had a physical altercation with Cleo McDougal near 7 Mile and Chalmers.  The assailant got into a car and was driven away, only to return moments later with another driver.  The assailant and driver then entered the apartment building on Fordham in Detroit where Cleo McDougal lived, and fired through the door, fatally shooting Cleo McDougal. EXHIBIT 1, DPD Report #06060701863.1.

44.    In the apartment at the time was McDougal's brother, Martines Carter, who was also fired at, but managed to jump out the window, escaping his own demise. Id.  It his first written statement, Carter said he was a stranger to the shooter and accomplices.  Id.

45.    People from the neighborhood who had observed the altercation and/or the subsequent entry into the apartment were interviewed at the scene:

    **a.  Martielle Barber**

    Mr. Barber was interviewed by SGT. LANESHA JONES at the scene at 12:35 p.m.   EXHIBIT 2, Barber statement, 6.7.06

    Mr. Barber was walking down the street and saw the victim and the suspect fighting outside at a corner gas station.  He saw a man in a white van warn bystanders to let the fight be "a one on one" and not to interfere.  He saw the suspect get kicked in the face.  He saw the suspect

get into a Periwinkle Blue Lumina a leave. He was able provide the identification of the driver of the suspect "Man-Man," along with a description of the vehicle, to SGT. JONES. Barber knew Man-Man as the brother of Mike, a man that used to live down the street from him. He watched the victim try to call someone, and go into his apartment on Fordham. Moments later, Barber heard shots, and when he walked onto the sidewalk to see what was going on, the killer confronted Mr. Barber face-to-face with an AK-47, jumped into a G-6 with another man, and left.

He described the suspect as 180-200 pounds, white t-shirt, dark pants, and had visible damage to his mouth, which was bleeding onto his white t-shirt from the fight.

He described the driver of the G-6 as a younger guy, mid-20's, well dressed.

He described the original driver, "Man-Man," as black, short, "ugly as hell" with "raggedy teeth" and eyes that "bulge a little bit."

Mr. Barber was asked to get into a police car with 4 officers in plainclothes (including WRIGHT and SGT. JONES) to show them where Man-Man, the driver of the Lumina lived, and he complied. EXHIBIT 3, Barber Affidavit.

## b. Cornell Bouru

Mr. Bouru was interviewed by Officer Herb Chapman at the scene at 1:35 p.m. EXHIBIT 4, Bouru statement, 6.7.06

Mr. Bouru was working in one of the apartments and witnessed the original fight when he stepped outside to his truck.

He described the suspect as 5' 10", 200 pounds, white t-shirt.

After witnessing the fight, he went back to the apartment to finish working, and he saw the suspect again, in the same white shirt, return, with a big gun, and begin kicking and firing at the door. Bouru fled to a building across the street.

15

### c. **Philip DeClark**

Mr. DeClark was interviewed by Lt. Emmanuel Martinez at the scene at 1:35 p.m. EXHIBIT 5, DeClark statement, 6.7.06

He was in a building across the street, and when he heard shots, he looked out the window and saw Martines Carter jumping out the window and fleeing from the shooter, described by him as a black male with a white t-shirt, firing an AK-47. He only saw the back of the shooter, would not be able to identify him except that his hair was neat and he did not have an afro.

### d. **Michael Calhoun**

Mr. Calhoun was interviewed by Sgt. Diaz at the scene at 1:45 p.m. EXHIBIT 6, Calhoun statement, 6.7.06

Mr. Calhoun was in front of the apartment building where the shooting occurred, heard the initial fight, then heard shots. When he heard shots, he ducked.

### e. **Martines Carter**

Mr. Carter, the victim's brother, was interviewed by Inv. Darryl Byrge at 1300 Beaubien, DPD headquarters, at 4:00 p.m; 5 hours after the incident. EXHIBIT 7, Carter statement, 6.7.06.

He told police that he saw the fight from the window between his brother and 3 men. He told police that he went to help his brother, and the suspect and he "had some words." He said he could pick the guys out if he were shown photos, but that he had never seen any of them before. He said the suspect came back after the fight with a different guy. He said he saw the same guy from the fight poking an AK-47 through the door, shoot his brother, and shoot at him. He said he jumped out the window as the suspect continued to fire at him. He said he hid next to the building until the suspect left the window, than ran to call the police. He again stated that he had never seen the men before in his life. He also stated that a bag of weed costs $5.

> For reasons unknown, Mr. Carter was re-interviewed at DPD
> Headquarters the very next afternoon on June 8, 2006 at 2:30 p.m. by
> INV. MAMIE HARDY. EXHIBIT 8, Carter statement, 6.8.06.
>
> During this interview, Carter was shown a single photograph of Elroy
> Jones.  He was shown a photograph of Elroy and asked if he
> recognized him, which he said he did from going to Webber middle
> school together.  Suddenly, Carter indicated that the suspect was Elroy
> Jones, 6' 2", 250 pounds, wearing a white tank top and dark shorts.
> He said that Cleo called their grandmother, Doris Palmer, to ask her to
> call 911.  He said he was looking out the window and could see Elroy
> and another man forcing their way into the apartment building.  He
> named Elroy as the man with the AK-47 shooting into the house, and
> out the window at him.

46.REQUEST FOR WARRANT EXHIBIT 9, Warrant Request, 6.9.06.  On

June 9, 2006, Investigator DALE COLLINS presented his Investigator's Report

and Request for Warrant to the Wayne County Prosecutor, citing Cleo McDougal

as the complainant.  The details provided to the prosecutor were as follows:

> Officers Eppenb rock and Halvorson responded to "shots fired," and upon
> their arrival, "the Officers were informed that the defendant Elroy Jones…"
> shot and killed Cleo McDougal and shot at Martenis Carter.  **This is untrue.**
>
> Eppenbrock and Halvorson authored report number 0606070183.2
> (EXHIBIT 10) around 3:00p.m. on June 7, 2006, indicating that they spoke
> with a witness working in vacant apartment #104 (Bouru) and the victim's
> brother, and listed the suspect as UNKNOWN.  This report was made before
> Carter's second statement and identification of ELROY JONES.  No
> supplemental report indicating any identification of any suspect was
> produced.
>
> "The investigation revealed that defendant Jones and the complainant
> McDougal were involved in an argument and fight in the street prior to the
> shooting…the defendant left the location, then returned with a weapon,
> kicked in the complainant's door, and shot him causing his death…"  **This is
> untrue**.  The investigation revealed that the suspect was seen by witnesses,
> and that NOBODY identified Elroy Jones with the exception of Martines

17

Carter, and this was after he denied recognizing any suspect, and during a "reinterview."

"Cornel Bouru will testify…that he saw the complainant and defendant fighting…he saw the defendant come in with a weapon…" **This is untrue**. Bouru did not identify Elroy Jones, and was not shown any photo array. Bouru said he did not recognize the assailants.

"Martielle Barber will testify that he…saw the complainant and defendant fighting in the street…coming through the alley he met up with the defendant…" **This is untrue.** Barber did not identify Elroy Jones, and was not shown any photo array. Barber said he did not recognize the assailants.

Although Officer Stinson is listed as making a report, no report of Stinson was turned over to anyone.

Although Officer Clark is listed as interviewing witnesses, no witness statements taken by Clark were turned over to anyone.

Of note is the fact that Inv. Byrge was not listed as a witness, nor was the fact made evident that Byrge interviewed Carter and during the first interview, Carter could not identify anyone.

No line-ups/show-ups were listed in the Warrant Request, because none of the eyewitnesses were provided any photos to examine during this investigation, with the exception of the lone photograph of ELROY JONES shown to Mr. Carter.

47.  Plaintiff, who was 6' tall and 310 pounds at the time, sporting a short afro, who bore no resemblance to the actual shooter, was arrested on or about June 10, 2006.

48.  On June 22, 2006, Martielle Barber was shown a photo array (which included Elroy Jones) by SGT. ANDERSON. He did not identify anyone, however, SGT. ANDERSON told Barber that the shooter was, in fact, in the line-up. ANDERSON told Barber that one specific man in the line-up, Elroy Jones,

was the shooter.  Exhibit 3.   Barber then authored another statement at 1300 Beaubien, which has never surfaced.  Id.

49.    The tactics of Sgt. Anderson are consistent with the known practice of DPD Homicide investigators to tell witnesses that they "can't pick the wrong guy" because "he's in there."

50.    After the interview but prior to the criminal trial, Barber saw the man who pointed the AK-47 at him out on the streets, and so Barber phoned Homicide, speaking with both a woman and SGT. ANDERSON himself, indicating that the shooter is out on the streets.  ANDERSON told Barber that "we already have our guy" and hung up on him.  Exhibit 3.

51.    Mr. Calhoun, after his statement and before the criminal trial, also saw the shooter out in the community, and likewise contacted SGT. ANDERSON to advise that he had seen the shooter out in the community, and did so on at least two separate occasions.  Exhibit 11, Joe Bruce affidavit.

52.    On July 2, 2006, DPD Officer Christine Thomas received an anonymous phone call while working the desk, and authored report number 0607020012.1. EXHIBIT 12. The following information was given to her:

   a. The name, description, and address of the real shooter, Robert Brown, consistent with the eyewitness descriptions;

   b. The fact that the shooter had a chipped tooth resulting from the altercation with McDougal;

   c.  The name, description of the getaway driver, Jonathan Murphey, consistent with eyewitness descriptions;

   d.  A description of the weapon used;

   e.  A description of the motive, location, and manner in which the murder was carried out;

   f.  The current location of the accomplice (he was in Detroit police custody at the time of the call and report).

53.    Ofc. Thomas searched CRISNET and found that the information matched the McDougal murder case for which ELROY JONES was being prosecuted, and therefore turned the information over to SGT. CHILDS and INV. ED WILLIAMS. Her report indicates that Murphey was actually in custody, and that ED WILLIAMS put a hold on Murphey for questioning in the morning. NO FURTHER ACTION WAS TAKEN.

54.    Witnesses have testified that SGT. ANDERSON attempted to convince them to commit perjury at the trial of ELROY JONES.

55.    On October 19, 2006, ELROY JONES was wrongfully convicted of 1) felony murder, 2) first degree murder, 3) assault with intent to murder, 4) home invasion (1st degree), 5) possession of firearm by a felon and 6) felony firearm on by a jury based on Defendants' willful failure to provide exculpatory information concerning the murder of Cleo McDougall – he was sentenced TO LIFE IN PRISON.

56.    The Court of Appeals reversed the trial court on February 27, 2008 and

granted a new trial; however, after a new trial, he was again found guilty on July

28, 2008 for the same failure to provide exculpatory information.

57.    The second conviction was appealed unsuccessfully in 2010 because the

exculpatory evidence remained in the possession of the Defendants.

## LAMPLIGHTER REVEALS DISTURBING TREND

58.    Plaintiff incorporates by reference the allegations set forth in each preceding

paragraph as if fully set forth herein.

59.    Sometime prior to and during 2006 Johnathan Murphey (hereafter

"Murphey") and Robert Brown (hereafter "Brown") resided in the area of 7 Mile

Road and Gratiot in Detroit, Michigan. Their primary and only sources of income

were from gang related organized crime. They were at all relevant times members

of an organization called the "Bloods" or "Seven Mile Dawgs" (hereafter

"Bloods") a violent street gang recognized and known to federal and state law

enforcement for various forms of organized crime.

60.    Murphey's involvement in Bloods-related criminal activity brought him to

the attention of members of federal law enforcement here in the United States

District Court for the Southern District of Michigan. He was charged and assigned

counsel sometime around 2012. While trying to resolve his case and hoping to

receive a reduced sentence in exchange for his cooperation, Murphey agreed to

cooperate with federal authorities. Thereafter, a proffer was scheduled with the

21

agreement that if Murphey provided truthful and useful information to the United

States Attorney, the United States Attorney would in turn make a motion pursuant

to FRCP 5K1 and ask the sentencing judge for a downward departure from the

sentencing guidelines.

61.    On March 5, 2012, a proffer interview of Jonathan Murphey was conducted.

The following information was given over to the FBI (EXHIBIT13):

a.  He witnessed a homicide in 2006

b.  Robert Brown told Murphey that he had been jumped, and asked Murphey to
    take him to get his gun.  Murphey took Brown in his grey Pontiac G6 and
    together they drove to Manning street to get Brown's AK-47.  Murphey then
    followed Brown's directive to drive to the apartment building at Seven Mile
    and Chalmers (McDougal's residence). Murphey followed Brown into the
    apartment building, and witnessed Brown shooting through the door, kicking
    in the door, shooting McDougal in the head, and shooting at Martines Carter
    as Carter jumped out the window.  Murphey then ran back to his car with
    Brown, and delivered Brown back to Manning and Queen.

c.  A second proffer interview of Murphey was conducted on May 8, 2012,
    where Murphey was shown a picture of Elroy Jones.  Murphey said he never
    saw Jones before, and McDougall was killed by Brown, not Jones.

62.    Murphey's revelations of March 5, and May 11, 2012 caused Sergeant

Michael Russell, violent crimes task force ("VCTF"), to investigate the conviction

of ELROY JONES for the murder of Cleo McDougall as well as the activities of

the killer, Robert Brown.  Russell went on to obtain the transcripts of the trial

where Jones was convicted, he re-interviewed the witnesses, conducted

photographic lineups that contained Brown and did follow-up investigation.

### a. Martielle Barber

Mr. Barber was re-interviewed by Sgt. Samuel Mackie and Sgt. Mike Russell on August 27, 2012. EXHIBIT 13, Barber statement, 8.27.12

Mr. Barber was shown a photo array, and identified the shooter as Robert Brown. Mr. Barber indicated that in previous line-ups, he did not recognize anyone, and felt Sgt. Anderson was trying to influence the identification process.

Mr. Barber also identified Man-Man as Marcus Martin. EXHIBIT 15.

### b. Cornell Bouru

Mr. Bouru was able to identify Brown as the shooter, stating that "he recognized this guy from the scene" on August 16, 2012. EXHIBIT 16.

### c. Michael Calhoun

Mr. Calhoun was re-interviewed by Ofc. Christengel and Sgt. Mike Russell on August 31, 2012. EXHIBIT17, Calhoun statement, 8.31.12.

Mr. Calhoun was able to identify Mr. Brown as the gentleman that made entry into Cleo McDougal's apartment with the AK-47 in 2006, and indicated that if he had been shown that line-up after Cleo was killed, he would have picked Brown.

### d. Martines Carter

Carter made his first statement to Detroit Police shortly after the murder of his brother on June 7, 2006, indicating that his brother was in a fight with another man near 7 Mile Road and Chalmers, two or three minutes after the fight was over the same man returned armed with an AK-47 and accompanied by another man he forced entry into their apartment where he and his brother were present and executed his brother who was helping him barricade the door. Carter jumped from the apartment building window and fled north-bound on Chalmers across 7 Mile Road to a grocery store. He indicated the

shooter was driven to the apartment by another man in an older-white Pontiac car.

Carter made his second statement on June 8, 2006. Present for the interview were INV. HARDY and SGT. ANDERSON (Sergeant Anderson was not present for the first interview).
During this statement Carter named the ELROY JONES as the person who killed his brother for the first time. He described the suspect as between six foot and six foot two, wearing a mustache and a goatee wearing a white tank top and dark colored shorts. He estimated the suspect's weight at 240 to 250 pounds. These descriptions do not match ELROY JONES.

Mr. Carter also testified regarding this case numerous times in addition to his two signed statements. Once at 36th District Court, and at both of Mr. Jones' trials. Carter testified that he knew ELROY JONES because they attended school together and thus he was able to identify him. Carter also testified that when the physical altercation before the shooting occurred. ELROY JONES was with his friends from high school, who Carter also alleged to have known.

When Sergeant Russell tried to verify this information with the Detroit Public Schools, he determined that ELROY JONES and Carter never attended the same school together at the same time. This was not the first time that Carter had made such a mistake. In fact, Carter also stated that he attended school and grew up with witness Martielle Barber, but this is also untrue. Carter's continued mistaken identities, and school relationships were never memorialized in any report by Sergeant Anderson. Throughout the trial the Defense had no knowledge of them.

63.     VCTF members also interviewed Martines Carter regarding his testimony, and showed him a number of "six packs." The photographs were all of deceased individuals. Carter said that he knew every single person whose photograph appeared in the "six pack." VCTF members were surprised by this and they continued to interview Defendant CARTER because it was impossible given the

24

fact that those in the photographs were diseased and they were not alive during

Defendant CARTER'S lifetime.

64.   Later in the interview, VCTF members asked Martines Carter how he was

employed, and he indicated that he worked for Tupac Shakur (a rap recording artist

who died in September of 1996). Carter described meeting Shakur on a regular

basis.  Carter then went on to describe to VCTF members a vehicle that he owned

that he indicated was a "transformer" Cadillac, that when he pushed a button,

turned into a Porsche.

65.   Violent Crimes Task Force agents also looked at all other police reports

associated with Brown and Murphey before and after June of 2006. They found

that sometime after the murder of Cleo McDougal in 2006, Brown's home was

raided by members of the Detroit Police Department.   During that raid, DPD

discovered an AK 47 like the one used in the June 2006 murder of Cleo McDougal

for which ELROY JONES was convicted.

66.   VCTF obtained all available police reports and quickly determined that the

case they were investigating was one for which the wrong individual had been

prosecuted and convicted; that person was ELROY JONES, who was serving a life

sentence within the Michigan Department of Corrections ("MDOC").

67.   VCTF obtained the file maintained and organized by the officer in charge of

the case, Defendant ANDERSON, which is commonly referred to as a "jacket"

that is kept and maintained in Detroit Police Department storage.

68.     VCTF members noted that nowhere within the confines of the "jacket" was the report they obtained from "CRISNET" authored by Christine Thomas and turned over to SGT. CHILDS and OFC. WILLIAMS.

69.     VCTF members ultimately turned over the memorialized findings of their investigation to members of the Wayne County Prosecutors Office, who after much delay and Court intervention, turned them over to counsel for ELROY JONES.

70.     Defense counsel for ELROY JONES learned of the existence of these materials through a Fox 2 news report.  Therefore, on November 21, 2012, counsel for ELROY JONES filed a motion to compel release of the exculpatory information.

71.     If not for an anonymous person who notified the press of the investigation into ELROY JONES' conviction, the witness statements that had been made to the Defendants in 2006 exonerating Plaintiff and identifying the true perpetrator (which statements were intentionally withheld by Defendants and the Wayne County Prosecutor's office until such disclosure was compelled by Order of the Court), Plaintiff may very well still be serving a life sentence today for crimes he did not commit.

72.     Upon receipt and review of the previously withheld information, on December 12, 2012, a Motion for Relief from Judgment under MCR 6.500 (which

was not ruled on until October 4, 2013), was ultimately granted, along with a motion for new trial, on December 3, 2013.

73.     On January 23, 2014, all charges against Plaintiff were dismissed, based upon lack of probable cause to proceed with the prosecution, resulting from the revelation of the previously withheld evidence.

74.     VCTF members also determined that Murphey's brother rented a Pontiac G6 and Jonathan Murphey had possession of that car on the date of McDougal's murder.

## THE CITY'S CUSTOM, PATTERN AND PRACTICE OF FAILING TO ADEQUATELY TRAIN, SUPERVISE AND DISCIPLINE DPD OFFICERS IN CONNECTION WITH FELONY INVESTIGATIONS

75.     Plaintiff incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

76.     It was the custom and policy of the Defendant CITY, by and through its final policymakers, to authorize, ratify, condone, tolerate and approve illegal and unconstitutional actions by Detroit Police Department officers, supervisors and investigators.

77.     Those illegal and unconstitutional actions and practices included but were not limited to:

        a.   Conducting inadequate investigations into serious crimes by making arbitrary arrests in order to close cases quickly and affirmatively choosing not to develop or pursue actual leads and evidence;

27

    b. Using unreliable, discredited and improper identification techniques like one-person photo array;

    c. Deliberately concealing witness statements that contain *Brady* material;

    d. Engaging in unduly suggestive behavior and improperly documenting and/or failing to document line-ups and the results; and

    e. Ignoring their constitutional duty to disclose exculpatory evidence to prosecutors and defense counsel, including the concealment of improper suggestion on the part of officers conducting line-ups and taking witness statements.

78. Defendant CITY, by and through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate investigatory techniques, evidence collection and evidence disclosure.

79. Through this custom and policy of failing to adequately train, supervise or discipline its officers, Defendant CITY abdicated its duty to ensure that officers would not violate the Constitutional rights of the citizens by acquiescing in the following behaviors and conduct such that they can be said to constitute the policy of the CITY:

    a. Conducting constitutionally inadequate investigations;

    b. Fabrication of inculpatory evidence during investigations;

    c. Conducting suggestive line-ups/show-ups;

    d. Manipulating witness testimony and statements;

    e.  Failing to ensure that homicide records and investigative materials are properly recorded, maintained, and processed through the chain of command;

    f.  Submitting Warrant Requests without probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted;

    g.  Deliberately failing to include known exculpatory evidence and *Brady* material to the prosecutor in the Warrant Request;

    h.  Failing to disclose to prosecutors and defense counsel material information favorable to criminal defendants such as ELROY JONES;

    i.  Manufacturing probable cause by fabricating inculpatory information in the Warrant  Request;

    j.  Failing to follow the duties imposed by *Brady v. Maryland* and its progeny; and

    k.  Administering arbitrary and unduly suggestive identification proceedings;

    l.  Telling witnesses at identification proceedings that "you can't pick the wrong person out; go ahead and pick one."

80.    Defendant CITY, by and through its final policymakers, had actual notice of the DPD's failures to train, supervise and/or discipline its employees. It failed to train and supervise them despite the obvious need, and although the CITY knew that it was foreseeable that their police officers would predictably confront these situations, and that as a result of the failure to train, supervise and/or discipline, constitutional violations would result.

81.    Because of these unconstitutional customs and policies maintained by Defendant CITY OF DETROIT, individuals such as Plaintiff ELROY JONES

were wrongfully arrested, convicted and imprisoned in violation of their

constitutional rights.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS

82.     Defendants, and each of them, acting under color of law, violated

PLAINTIFF'S constitutionally-protected rights, including his right to liberty

protected by the Due Process clause of the Fourteenth Amendment to the U. S.

Constitution, as well as his right to be free from unlawful detention without

probable cause, guaranteed by the Fourth Amendment, and his right to a fair trial,

guaranteed by the Sixth Amendment, by the following conduct:

> a. Defendants, COLLINS, ANDERSON, HARDY, CHILDS,
>    WILLIAMS, JONES and WRIGHT deliberately and consciously
>    failed to disclose exculpatory evidence in their possession to the
>    prosecutors, before the Preliminary Exam and trial, which was
>    apparent exculpatory evidence, pursuant to *Brady v Maryland*, 373
>    US 83 (1963), which would have resulted in a finding of lack of
>    probable cause at the preliminary exam or an acquittal at trial;
>
> b. Defendants ANDERSON and COLLINS deliberately and
>    knowingly supplied false information and omitted information
>    which showed a reckless disregard for the truth in requesting an
>    arrest warrant which was material to a finding of probable cause;
>
> c. The individual Defendants, and each of them, conspired to, and
>    did, conceal the above- referenced material exculpatory evidence,
>    from Plaintiff throughout the course of the criminal proceedings,
>    with the common objective being to deprive ELROY JONES of his
>    constitutionally guaranteed rights set forth above, which caused
>    Plaintiff's injuries;
>
> d. The acts and omissions of each Defendant were under color of law,
>    and were in accordance with the City of Detroit's practice, usage,

30

policy and procedures, and customs of deliberate indifference to Plaintiff's rights as secured under the U.S. Constitution.

e.  Defendant, CITY OF DETROIT, failed to safeguard against, and affirmatively ratified the known unconstitutional conduct of its officers as enumerated herein, such failure amounting to a tacit approval of said conduct and Defendant City of Detroit is directly liable for the creation of policies, practices and customs, including a failure to provide adequate training to its police officers, including the individual police officer Defendants, regarding the government's constitutional obligation to turn over apparent exculpatory evidence to the prosecutors, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual police Defendants' violations of PLAINTIFF'S constitutional rights;

f.  Defendant City of Detroit had a custom, pattern and/or practice of failing to take disciplinary action to correct or remedy the unlawful conduct of Defendant Officers and other officers who engaged in similar conduct.

g.   Defendant City of Detroit had a custom, pattern and/or practice of failing to supervise and/or train Defendant Officers and other officers who engaged in similar conduct.

h.  Defendant City of Detroit has a long standing custom, pattern and/or practice of demonstrating deliberate indifference to unreasonable, inadequate and deficient investigations, illegal searches and seizures and excessive force complained of against its officers.

i.  Defendant City of Detroit demonstrated deliberate indifference by the adherence to, application and interpretation of, and/or acquiescence in the following policies, customs, patterns and practices, which were wholly defective:

    i.  failing to adequately screen active duty police officers and new recruits for propensities for abuses of power and psychological disturbances which could forseeably endanger citizens;

31

      ii.  tacitly approving a custom of failing to discipline officers, including WILLIAMS, ANDERSON and COLLINS, who have historically made unreasonable, inadequate and deficient investigations;

      iii.  failing to adequately investigate complaints against officers, including WILLIAMS, ANDERSON and COLLINS, who were claimed to have performed unreasonable, inadequate and deficient investigations, illegal or unreasonable searches and seizures and fabricated or concealed evidence;

      iv.  failing to train officers regarding: proper investigation of crime under these circumstances, including warrant requests.

    j.  Defendant City of Detroit was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and was conscious of the risk of harm posed by the conduct of Defendant Officers.

    k.  The failure of Defendant City of Detroit, under the circumstances, to properly supervise, train and/or discipline Defendant officers and officers who engaged in similar misconduct was objectively unreasonable and demonstrated a deliberate indifference to incidents and complaints against its officers, and deliberate indifference to the rights of persons such as Plaintiff.

83.    The constitutional rights which were violated by Defendants, as set forth above, were clearly established before June through July of 2006.

84.    As a direct and proximate result of the Defendants' willful violation of Plaintiff's constitutionally protected rights, ELROY JONES was detained without probable cause, charged with crimes he did not commit, and wrongfully convicted and imprisoned, causing him to suffer the injuries and damages set forth herein.

32

## COUNT TWO
## MALICIOUS PROSECUTION IN VIOLATION OF THE 4TH AMENDMENT

85.     Plaintiff realleges each preceding paragraph as if more fully stated herein.

86.     Defendants, and each of them, made, influenced or participated in the decision to prosecute Plaintiff.

87.     There was no probable cause for the criminal prosecution.

88.     Defendants, and each of them, knowingly or recklessly presented false information to the prosecutor to obtain the Warrant for Plaintiff's arrest.

89.     Defendants, and each of them, knowingly or recklessly withheld exculpatory information from the prosecutor to obtain the Warrant for Plaintiff's arrest.

90.     As a consequence of the criminal proceedings, the Plaintiff suffered a deprivation of liberty apart from the initial arrest.

91.     Said prosecution terminated in Plaintiff's favor.

92.     Defendants, and each of them, wrongfully investigated, wrongfully initiated and wrongfully continued the prosecution of Plaintiffs without probable cause, with malice or a purpose other than to bring the true offender to justice.

93.     As a direct and proximate cause of Defendants' conduct Plaintiff suffered injury and damages as set forth herein.

<u>COUNT THREE</u>
<u>GROSS NEGLIGENCE – STATE CLAIM</u>

94.    Plaintiff realleges each preceding paragraph as if more fully stated herein.

95.    Defendants, in falsely arresting, falsely imprisoning and maliciously prosecuting Plaintiff did act in a manner that was grossly negligent in the following ways:

> a.  These defendants knew that their actions, including failure to disclose, and indeed affirmatively concealing, information that clearly constituted exculpatory evidence;
>
> b.  Despite this knowledge, these Defendants deliberately persisted in their failure to disclose and in concealing the exculpatory information and evidence;
>
> c.  These Defendants well knew that their failure to disclose, and in fact concealing, the exculpatory evidence would harm the Plaintiff, in the ways set forth above;
>
> d.  Notwithstanding the knowledge that their actions, as set forth above, would seriously harm the Plaintiff, these Defendants failed to take any action to prevent that harm;
>
> e.  There was no reasonable law enforcement purpose served by the actions of the Defendants in failing to disclose, and in fact concealing the aforementioned exculpatory evidence;
>
> f.  Indeed, revealing and disclosing such evidence would have, in no way, weakened or undermined any reasonable or legitimated law enforcement purpose.

96.    Furthermore, Defendants ANDERSON, HARDY and COLLINS improperly suggested to witnesses that the alleged killer was ELROY JONES, notwithstanding their knowledge that the Plaintiff was not the killer and that such improper and false suggestions would lead to serious harm and injury to the Plaintiff. These

34

improper and false suggestions were undertaken despite the fact that there was no reasonable or legitimate law enforcement purpose served by these improper and false suggestions and actions.

97.     As a direct and proximate result of these grossly negligent acts and conduct of the Defendants, Plaintiff has suffered severe damages as set forth herein.

## **DAMAGES**

98.     As a direct and proximate result of the acts and conduct of the Defendants in the initiation and institution of the aforementioned baseless and malicious prosecution, resulting in his unjust conviction and imprisonment, Plaintiff ELROY JONES has suffered severe damages, many of which effects continue to plague him to this day and will plague him for the rest of his life, including but not limited to:

a. Deprivation of liberty for over 7 years;

b. Personal and physical injuries;

c. Pain and suffering;

d. Severe mental anguish;

e. Emotional distress;

f. Extreme fear;

g. Economic damages including loss of income;

h. Infliction of physical illness and injury resulting from his confinement;

i. Inadequate medical care; humiliation, indignities, and embarrassment;

j. Degradation;

k. Restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

l. Damage to his relationship with his son -- his only child -- who was one year old when Plaintiff went to prison and the parental rights of which were terminated as the direct result of his conviction.

m. Damage to his relationship with his family, including but not limited to his parents and his sister.

n. Exemplary damages and reasonable attorney fees, as provided by court rule and statutes, including but not limited to 42 USC 1988.

WHEREFORE, PLAINTIFF prays for such compensatory damages as are available pursuant to federal law. Plaintiffs further seek punitive damages pursuant to 42 USC §1983 as to the individual Defendants, jointly and severally, together with pre-judgment interest, costs and attorney fees pursuant to 42 USC §1988 in an amount to be determined by the Court.

| | Respectfully submitted, |
| --- | --- |
| | WE FIGHT THE LAW, PLLC |
| CRAIG A. TANK, P.C. | /s/ Racine Miller |
| By:  Craig A. Tank | By:  Racine M. Miller |
| Attorneys for Plaintiffs | Attorneys for Plaintiff |
| 228 North Main Ste H | 17600 Northland Pk Ct Ste 210 |
| Romeo, MI 48065 | Southfield, MI 48075 |
| Southfield, MI 48075 | (248) 443-9030 F: (248) 443-9031 |
| (313) 732-7134 | racine.michelle@gmail.com |
| craigtank@gmail.com | (P72612) |
| (P58360) | |

Dated: June 24, 2015